Shoreman's Union, Local 1, No. 18-2254. Thank you. Good morning. Arthur Schwartz. Mr. Schwartz, why don't you wait just a minute while people get resituated, okay? All right. Good morning. Your Honor, we have a case here that was dismissed by the district court that had two distinct claims in it. One had two subsets. The first claim had to do with the union coercing the discharge of my client, Mr. Caldarera, and then there was an improper discharge claim, a large versus the employer global, which is called a hybrid claim. The facts here is that the plaintiff had a ‑‑ this is as alleged in the complaint because this is a 12B6 motion. The plaintiff argued with his shop steward about allowing no-show jobs. The steward walked into the manager's office and said, I don't want him working here anymore. Check him out. Three days later, the president of the company said, after today, you're not getting hired here anymore. In mid‑December, he came back for a couple of days. He was told that his name was out of the system. He argued. He got to work for two days, and then on the second day, he received what was called a no-hire letter, and he didn't work at Global again until well after the complaint was filed. Those were the facts in front of the judge. Five months later, after the 12B6 motion, the first 12B6 motion was briefed, the employers and the union had a joint labor management committee meeting where they considered this particular issue by saying, we're going to consider this even though there was no grievance filed because Mr. Calderera felt, why file a grievance? They're both allied against me. They considered it. They said, he should have filed a grievance. It's too late, and it's barred. That meeting, which happened five months after the First Amendment complaint, there was no notice that this was some sort of evidentiary hearing. There was no notice that the claim against Global was going to be considered at that meeting. You represented him at that meeting, didn't you? I was there at the meeting, but nobody said there was no notice there will be an evidentiary hearing. Be prepared to have witnesses and evidence to present. It was simply as a step forth. It was the next step in a grievance appeal procedure. The only record about that hearing, about what went on at that hearing, was my affidavit that said there were 40 men in a room. We didn't know who were witnesses, who were union, who was management. It was a very hostile environment. The judge then issued a decision on the discharge where they basically said there was no grievance and it was untimely. That's all they said. A collective bargaining agreement anticipates or envisions the adjudication of grievances by a committee of that sort, doesn't it? A joint employer union. Well, I believe it's a three-step procedure. The first step is labor adjusters. The second is labor relations committee, which is a joint. They're both joint committees. And then if there's a disagreement at the second step, it goes to arbitration. But with respect to the key here really is with respect to the Global claim and the claim against the union, which wasn't appealed. You're alleging collusion between the employer and the union. But the CBA envisions. Right. It wasn't just a bare allegation of collusion. But what do you rely on to put flesh on those bones? We allege that Mr. Fulbrook had an argument about no-show jobs, walked into the office, said, I want this guy checked out. The president of the company said, you're not going to work here anymore. And he worked there two more days. Got a no-hire letter and didn't work there anymore. So that's the allegation that we made. We said the union caused the employer to terminate his employment, and he didn't file a grievance about it. How does that taint the proceedings of the LRT? Because the people, and as this court said in the, I think there's a case exactly on point, the Hiller case, Hiller v. Liquor Salesman's Union, 338F2nd778, where the union and management are allied against an employee. He doesn't have any obligation to file a grievance and exhaust the grievance procedure because he knows the union is on the other side. The union was the one, and he had already sued the union. He was already in court against the union. He hadn't appealed the discharge to the union. But, again, just to make sure I'm understanding correctly, what you're relying on for, as evidence of collusion in adjudicating grievances later on, is the altercation that occurred in September and then the company owner, the GCT owner or supervisor-level person saying something to your client. Is that right? Saying, you're not going to work here anymore, not just something. And to us, that relieved him of the obligation to have to pursue it through the grievance procedure. And this committee considered it, even though he hadn't grieved it through the grievance procedure, and then the judge deferred to their, with respect to the employer, deferred to their decision. And then when we alleged that that meeting was wholly hostile, unclear, who was who in the room, she said, I can't consider what Mr. Schwartz said because it wasn't in the First Amendment complaint. But the First Amendment complaint predated the meeting by five months. And this proceeding happened subsequently. So the judge treated it like a summary judgment motion, not like a 12 v. 6 motion. Let me ask one other question. You allege that filing a grievance as to the termination would have been futile, and that excused your client from the exhaustion requirement. But he filed 12 or 13 other grievances. Is that correct? So then there was a second claim, which had to do with not getting work assignments like he had been getting before in line with his seniority. There were two elements to that, too. One is that the union was coercing the employers, after he had the argument about no-show jobs, to not give him work. The second was that it violated the contract that he was supposed to get those jobs anyway, no matter what the union said. So he filed grievances with respect to the employers, partly because I advised him to do that and it created a record. And the judge did not consider the ruling of the Labor Relations Committee with respect to that, because there weren't ruling on whether the union did anything right or wrong. They were ruling whether the employers did anything right or wrong. We didn't sue any of the employers over the job referrals. And what facts did you allege in your amended complaint with regard to the coercion that you just referenced? We said that immediately after the argument with Fulbrook, so he got sent back into the system where he had to go shape every day and get a job, that he started getting assignments that were out of line with his seniority, that when he got to workplaces he was given jobs that were less favorable. So you're relying on proximity in time. And also he immediately had a 25% decline in his income, which reflected not that it was just in his head that this was going on, but it actually started to go on. Thank you very much. Okay. We'll hear from Mr. Sheridan. You've reserved two minutes rebuttal. Good morning, Your Honors. John Sheridan from Marin and Missoula Martin, and I represent the International Long-Term Association Local 1 in this matter. Your Honors, this matter was initially filed as a hybrid claim against employer GCT and Local 1. The nature of the industry, as is described in the complaint, is that there is various different local unions who do longshore work or checker work. Local 1 is the checker union. I wanted to address some of the items that were listed by my adversary. The description that the discharge that took place is very attenuated over a long period of time. The plaintiff evidently had a quarrel with the shop steward. There was allegations in the earlier complaint that the shop steward was the same as the dock boss. That has now been clarified. The shop steward is simply the union rep, and he has no control over hiring. After this discussion with the ---- That happened in September. That happened in September. And the firing happens. Well, the firing, the do not hire letter comes out at December 30th, received in January. Three months. Three months. And in the interim, he was working. He worked, obviously, a few days later when he got chastised by Mr. Price. He worked in December when he, in the ---- At GCS? GCT. Yes. Yes, ma'am. There's a lot of availability to work all over the port, but he seemed to have a relationship with GCT at that time that he was working frequently for them. I'm sorry. I thought the record show or his allegation was that he worked only three days for them in December, while he may have worked for other employers in the port during the time. But it was GCT was only a few days in December, which looked like it might have been a mistake even. You're correct that he worked. The records show in this case that he worked at least a couple days after the altercation and a few days in December because he filed a grievance for one of those days that he said he didn't get the assignment that he's entitled to. Your whole argument, the suggestion that the GCT firing isn't linked to the argument to the extent you defend that by saying, well, he worked at GCT. He only worked a few days at GCT. Well, no, he ---- What's your argument for wanting ---- Your Honor, I'm just saying he did work more days at GCT, but I'm saying based upon the complaint and the grievances filed, it shows that even in the complaint that he did not ---- it was a three-month period and he worked in the interim. And then there was a do not hire letter issued for another incident. He alleges that his take-home pay went down 25%, and that was a result that this was inexplicable other than through some kind of collusion or, you know, the union giving a sign to the employers that he was causing difficulties and so don't hire him. And he alleges this altercation, the do not hire letter, and some proximity in time, as Judge Radji is pointing out, between the September fight, the December letter, and reduced employment at GCT. So why isn't that enough of a basis for us to infer that there's some potential either a duty of fair representation violation in the grievances? His grievances weren't successful. He's had no success seeking a remedy. Why isn't that enough for him to go forward? Your Honor, I mean, based upon the complaint, he was not successful. But as the district court noted, there was a backpedaling when the do not hire letter was withdrawn, and that is perhaps the reason why he didn't file any grievance. But based upon just the complaint, it's not enough just to say that there was a three-month period between a lowly shop steward having words with him telling the employer he has to be checked out, then him not being no allegations he's checked out, no allegations he's fired, and then the allegation that he had a reduction in income. The allegation was also that someone of a seniority at GCT told him he won't work here again. No, the allegation was that the management, Mr. Price, told him you're not going to be working here. That was three days after the argument. He's suggesting that that is a sign of some kind of collusion, and, in fact, he was shut out afterwards. He's suggesting that, but just that bare allegation alone is not enough because he wasn't shut out until another three months later at the end of December. And the allegation about the reduction in income can be caused by anything. The port allows people to work throughout the port for different employers. They can decline jobs on occasion, and the business goes up and down. So it's just not enough to say that there's a reduction in income. Therefore, we can infer collusion between the union and the employer when the union has no control over hiring or assignments. Well, he has no control, but he can influence. That's the argument, that he influenced the employer. I suppose the argument is that he has no contractual control over hiring or assignments, but that there has to be some behind-the-scenes influence by the union officials. I think it has to be more than just. . . Union officials do his loyalty to the employee. Correct. That's the breach that's alleged. That's the alleged. Crediting the complaint by going into the employer and saying, get rid of this guy or words to that effect, that that was disloyal to the employee. Now tell us why that shouldn't be how we view this. If the allegation was that he had gone into the employer and said, get rid of this guy, and then the firing had happened the next day because of that, and the union had not pursued any other grievances for him and did not hear any grievances, then there might be more of a claim. But that's not the allegations. The allegations was that this low-level shop steward in one situation had an argument, said check him out. There's no allegation he was checked out. He was hired a few more days. Three months later he is terminated for another reason. The discussion off the record in the conference said that that letter was withdrawn. And also there's no allegations as specifics about any other agent, officer, employee of Local 1. The record's devoid. The allegations are devoid. I mean, David Chickalese was named as a defendant, but he's not named as having any sort of influence or any sort of details. Thank yours. Thank you very much. Mr. Schwartz, you have two minutes to rebuttal. Your Honor. Oh, I'm sorry. Pardon me. We had just said seven and seven. Your Honor, it was five and two. Oh, I'm sorry. That wasn't noted here. Okay. Pardon me. All right. Please go ahead. Mr. Weinberger. Pardon me. Thank you, Your Honors. May it please the Court. My name is Ian Weinberger. I'm here on behalf of Appellee G.C.T. Bayonne. The one key fact that I'd like to point out that I think needs to be addressed is that it's a multi-employer bargaining association and multiple unions, that there's the international union that is affiliated with the local, which in this case is Local 1. Just because there is an issue with one employer, one local, doesn't mean that everyone is arrayed against Mr. Calderero. The facts of the matter are that the LRC decision was decided by no members of Local 1. There was no one on the panel. It was a hearing set up pursuant to the terms of the collective bargaining agreement, and the Court, as Judge Caproni found below, was required to defer to that decision because it decided the case and it comported with the Supreme Court's holding and risks and all the similar cases in that regard. The other thing I'd like to point out is that Mr. Calderero ---- You're saying this has already been decided by arbitration and we should allow that arbitration to stand. Correct, Your Honor. And the other thing I'd like to point out is as it relates to my client, Mr. Calderero admits that he never even attempted to utilize the grievance procedure. As the Supreme Court held in Glover, also Vacaville-Sipes, that he has to at least make an effort. Mr. Schwartz, my colleague, said on the record that he felt he didn't even need to do that, and that's just not what the cases say. You have to go through the process up to a point. Remember, what is the scope? How do you see or describe the scope of the LRC decision in terms of the GCT termination as well as the unfavorable work assignments that Mr. Calderero repeatedly grieved? Sure. As to the first question, Your Honor, as to my client, there was no grievance ever filed concerning the September 2016 incident. Nowhere is there a grievance filed regarding the December 30, 2016 incident. The contract specifically says that any grievance has to be brought within 180 days of the event. If it's not brought within that time period, it's waived. So that was just an affirmation by the LRC that these specific allegations relating to Mr. Calderero were waived, and there was no decision that was even necessary beyond that. As it relates to the second question concerning the scope of the job assignments, it was a question of how the employer analyzed the collective bargaining agreement. The collective bargaining agreement provides the employers in the Port of New York and New Jersey, both GCT, Bayonne, as well as all the other terminal operators, the ability to decide how they want to give work out, essentially. So that was also decided by the LRC that it was a management's right to make that determination. Nothing else, Your Honors. Thank you very much. Now we'll hear from Mr. Schwartz. Two minutes rebuttal, please. Your Honors, first with respect to the termination, in the complaint it said, on or about September 26th, the appellant was approached by Kevin Price, who was identified as the president of GCT, who stated, after today you're not getting hired here anymore, quote. When appellant was asked why, Price responded that he didn't have to give a reason, no formal discipline, charges, reprimand, or opportunity to declare his name was given to appellant. In mid-December, appellant was assigned to work at Global, or plaintiff was assigned to work at Global. When he arrived, he found that his security card would not work to get him in the building. He spoke with the director of safety and security, who told him that Kevin Price had directed him to take appellant out of the system. He was then allowed to work for two days when he was then given a do not hire letter. To say that in between he worked is somewhat a stretch of the facts, particularly on a 12B6 motion. Second, with respect to the LRC and Global, the LRC, he didn't have a grievance in front of the LRC. He wasn't given notice that he was appearing in front of this body to talk about the firing at Global, and it didn't even come up at the meeting. There's no evidence at all about how this came up. The letter about the LRC meeting doesn't say. And did he have no obligation to grieve the GCT termination? Because this court has said in the Hiller case, which I cite in my second brief at length, in the Hiller decision, this court said that where someone doesn't have to play out the grievance procedure until the point where he realizes the union is about to give it to him, he doesn't have to pursue it. This court said even if they let him have a lawyer in the Hiller decision, even if a lawyer is allowed to go to this, even if that's a provision, well, you can bring your own lawyer there. As long as the panel is made up of union and management, you don't have to pursue the grievance procedure, you don't have to spend your time. But most important with respect to the LRC, it was a post-First Amendment complaint event with no factual development. All that was put in was the decision and the letter telling Mr. Calderero that there was going to be this meeting. We don't know who was there. Council says, oh, it didn't have this union, it had that union, it didn't have this employer, it didn't have. There's none of that in the record. That's summary judgment material. That's material to be developed, you know, on the way to during discovery, not on a 12B6 motion. Wasn't there a we're dealing with the first complaint. Wasn't there permission granted to do an amended complaint that was not taken? The amended complaint was going to add an employer, a claim against employers, for the referral on the referral issue, on the job assignment issue. And we filed it as a separate complaint, and then I decided that, in fact, the issues were too complicated to do at that point, so we didn't pursue it. We withdrew it voluntarily. But the claim against the union that immediately upon fighting with Fulbright and accusing the union of allowing no-show jobs, and you're talking about the Longshoremen's Union, which the court can take some judicial notice about, that he said, why aren't you pursuing these no-show jobs and the people who don't show up to work? And Fulbright said, get this guy out of here or he's a troublemaker. And then immediately after that, he starts getting referred to lesser jobs with people who have lower seniority. He stops getting his overtime assignments. And he said the union that it occurred immediately afterwards, not months later, and then attached to the complaint are example after example after example, 13 examples. What is it you want us to take judicial notice of about the Longshoremen's Union? About the number of indictments and convictions of officials of the Longshoremen's Union that have occurred over the years. Let me ask you to clarify, Madam Justice Schwartz. I understand the argument you've made challenging the dismissal of the hybrid 301 claim. Right. If for any reason we were not to be persuaded by your argument on that point, what remains of your claim against the union for the wrongful firing? How does that get maintained if we do not agree with your challenge to the dismissal of the hybrid claim? That is the hybrid. The hybrid claim is wrongful firing. I'm sure I understood. It's hybrid. Now we know hybrid cars. Wrongful firing and wrongful union action riding along the road together. I wasn't missing anything. Thank you. Very good. I think we have the arguments. We'll take the matter on advisement. We have two more matters on the calendar for today, Zhang v. Whitaker and James v. Whitaker. Those are both on submission, so the clerk will please adjourn court. Thank you.